IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


JAMES ORIN OGLE                                        PETITIONER

VS.                          CIVIL ACTION NO. 1:06-cv-1144(DCB)
                             Criminal No. 1:01-cr-29(DCB)(LG)

UNITED STATES OF AMERICA                               RESPONDENT


<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on James Orin Ogle's Motion to
Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255
**(docket entry 167** in criminal action 1:01cr29**)**, and Motion for
Summary Judgment **(docket entry 177** in criminal action 1:01cr29**)**.
After careful consideration of the motions, the government's
response, and the applicable law, the Court finds as follows:

Petitioner James Orin Ogle ("Ogle") seeks federal habeas
corpus relief under 28 U.S.C. § 2255, alleging three grounds for
relief. The first ground alleges ineffective assistance of
counsel. The defendant's second ground alleges "structural error"
in the Court's findings of fact in determining the proper guideline
calculation. The third ground alleges cumulative error, <u>i.e.</u> if
grounds one and two are if insufficient by themselves, they are
cumulatively sufficient as to require the vacating of defendant's
sentence.

Ogle was charged in an indictment with conspiracy to launder
money and attempt to launder money. He was convicted of both
counts and sentenced to 121 months of imprisonment. Ogle appealed

the conviction and sentence and the Fifth Circuit affirmed his conviction, but remanded the case for re-sentencing on the impact of U.S.S.C.G. §2X1.1. On resentencing, the Court sentenced him to 121 months imprisonment. That sentence was affirmed by the Fifth Circuit. The defendant then petitioned for <u>certiorari</u>. The Supreme Court granted the petition, vacated the judgment, and remanded the case to the Fifth Circuit for further consideration in light of <u>Booker</u>. On June 27, 2005, the Fifth Circuit reinstated its prior judgment finding that <u>Booker</u> was first raised on the petition for <u>certiorari</u> and was therefore waived absent extraordinary circumstances. Finding none, the appellate court re-instated the judgment.

## I. EVIDENCE AT TRIAL

The evidence at trial showed that Ogle voluntarily joined in a conspiracy to launder $12 million that had been represented as drug proceeds, and traveled to Biloxi, Mississippi to pick up the cash. The proof established that Ogle was invited to participate in the conduct by his partner Hemmings and that Ogle actively pursued the money laundering deal after Hemmings was jailed on unrelated state charges.

At trial, Wendell Blount, a confidential informant for the United States Customs Service, described a business meeting in Orlando at which he decided to ask if anyone there "knew anybody that has any experience working offshore, any offshore connections

that might could get some money cleaned up." Tr. 106. One of the participants told Blount about Hemmings and how to contact him. Id. Following the Orlando meeting, Blount advised Customs agent Mike Tyson of his plans to contact Hemmings. Tr. 107, 247. When Blount first called Hemmings, he explained that he had some money he wanted to get into circulation in order to be able to spend it. Tr. 107. Hemmings replied that "he had all kind of offshore dealings and could help." Tr. 108. Blount and Hemmings spoke several more times by telephone before agreeing to meet in person. Id.

Blount first met with Hemmings during a videotaped meeting at the Imperial Palace Hotel in Biloxi on March 3, 2001. As the conversation progressed, Blount said, "Casey, let me just get to the point an' tell you what I need." GX 1a, at 11. Blount told Hemmings, "You've heard me talk about my guy in Beaumont that's in prison." Id. "He ran a certain operation for me that no one else had anything to do with at all.... [T]his guy handled all my offshore business. [But with him] "sittin' in a Federal prison in Beaumont, Texas ... he can't do what I need him to do." Id. Blount then explained that he had "some money sitting around that he would normally have gotten into circulation for me." GX 1a, at 12. Blount said his friend "ran a drug operation for me" and "that's where the money came from." Id. "I've got a little over 12 million dollars that's in cash that I need to get somewhere.

Uh, probably an offshore deal of some sort. But [so] I could get it back into my hands where I can spend it." Hemmings responded: "You'd been a lot better off not letting me know .... Not because of where it comes from, but because I don't know you." Id.

Despite claiming he would rather not have known the source of the funds, Hemmings immediately began considering "having it go once through a process offshore" and assured Blount of his expertise: "I played it down on the telephone. But we're very good." GX 1a, at 12-13. Hemmings bragged: "I could work magic for you offshore." Hemmings said he could arrange it so Blount would "never have to show where the money is coming from." Id. at 20-21. During the meeting, Hemmings answered a cellular telephone call from Ogle. They discussed an upcoming trip Ogle was taking to China and other matters, including using their "industrial property in Alabama" as part of a transaction they were considering. GX 1a, at 24-25. When Hemmings hung up, he told Blount: "That was my business partner." Id. at 26. Later, Hemmings mentioned his girlfriend Johanna Porche and said: "[T]here's three people that know I'm having this meeting. All of them know that there's potential to do some international business." GX 1a, at 31. But Hemmings told Blount he would keep their conversation confidential. Id.

After Hemmings inquired further about the source of the funds, he told Blount he was interested but wanted to discuss it with his

partner first.  GX 1a, at 38, 57.  Hemmings explained: "I need to have some very confidential conversations, not on the cell phone, with my business partner ....  I'm going to give him a hypothetical here in the next few days."  GX 1a, at 73.  Hemmings told Blount he could trust his partner "absolutely" and described Ogle's expertise in "the cash game."  He touted Ogle's connections in "international politics" and said they were in the process of buying their own "class one bank" in Switzerland.  GX 1a, at 57, 60.  In later promoting their experience in handling cash, Hemmings said: "That cash ... is nothing new ....  We see this all the time.  This is not new."  GX 1a, at 85.  After discussing additional details, they concluded the meeting with Blount telling Hemmings: "Okay. I will wait on your phone call."  Id. at 96.

After the meeting, Blount was driving to the United States Customs office in Gulfport when Hemmings called Blount on his cellular telephone.  Hemmings said he had "good news" and asked that they meet again.  Tr. 123.

When Blount returned to the Imperial Palace to meet Hemmings, they continued their discussions in Blount's car, which had been outfitted with a recorder.  Tr. 124.  Hemmings described a telephone call he had just had with Ogle.  When Blount asked if he was "talking about the guy in Atlanta," Hemmings answered: "He is me."  GX 2a, at 5.  Hemmings described Ogle as "my Siamese twin that's attached to me on my hip."  Hemmings added that "this

situation is known to two people ... one is James and the other is Johanna just since she lives my life with me." Id. But Hemmings sought to allay any concern that he had said too much: "What we discussed in this, in that room will never be discussed again. And has not been discussed. Nor will it ever." Id. at 7.

Hemmings expressed surprise at his partner's eagerness to pursue the deal: "Well, I'm getting to learn a little more about my partner now .... He goes, he goes, what the fuck were you expecting? And without getting into particulars, you know, hypothetical situation .... [W]e're much more receptive than what, what I anticipated. ... [H]e was ready for it. Uh I was not, by the way. I was not. You caught me off guard .... I know that you could tell by the look on my face ...." GX 2a, at 4-6. Hemmings said Ogle "wanted to know ... is 90 days a good time frame to be able to have assets physical and clean and usable?" Id. at 6. Blount replied: "I've been sitting on this for over two years. I'm in no hurry." Id.

Hemmings continued to express surprise at how receptive Ogle was to the proposition: "[T]his is just another day in the park. This transaction, apparently unbeknownst to me, is taking place ... all the time an' I didn't even know." GX 2a, at 9. Hemmings proposed that Blount travel to Atlanta to meet Ogle. Id. at 10. Hemmings then called Ogle on his cellular telephone "to tentatively pencil in" a meeting of "the new triumvirate." Id. at 12.

Hemmings returned to the topic of how amenable Ogle was to the proposal:

> I've explained you know, that ... we are expected to be
> the physical handlers.  And, and for this to be discrete
> and not to go any farther.  Fully understood ....  I'm
> really surprised at how uh, how nonchalant and, and easy
> this, this is ....  Uh, I knew that ... within the group
> there was uh, much more practical life experience on the
> subject matter.  I just didn't know how much apparently.

GX 2a, at 17-18.  Blount told Hemmings he was "comfortable with James Ogle as long as you tell me it's ok."  The meeting concluded with Blount agreeing to call Hemmings later.  Id.

Following the Biloxi meeting, Blount and Hemmings discussed by phone the plans for the meeting with Ogle, which later was changed from Atlanta to Jackson.  Blount first met Ogle on March 28, 2001, when he and Hemmings arrived at the Edison-Walthall Hotel.  During the meeting, Blount told Ogle: "Well, James, I've heard a lot about you from Casey.  An' of course, he says I can trust you with my life ...."  GX 3a, at 5.  Ogle described his business interests and handed Blount a card listing him as president of Nu-Tech Development Corp. of Atlanta.  Id. at 9; GX 4.  Addressing Ogle, Blount then elaborated on what he had told Hemmings earlier about the deal:

> I assume Casey has told you the dilemma I have with the
> ... 12 million ....  I don't know if he told you the
> details, but I got into it by helpin' a friend ....  [H]e
> was doing it to make some money ..., but he was indicted
> ....  [H]e actually went to jail 2 years ago.  Nothing to
> do with that but ... he bought some insurance companies
> in Louisiana ....  And ... became the fall guy for
> everybody.  An' that's makin' a real long story short.

7

> Uh, but anyway he took the money I made, and my part of
> the profit is, was, was the 12 million. And uh, I just
> need to get it to where I can use it and Casey said you'd
> have probably three, four different solutions for me.

GX 3a, at 17-18. Ogle responded that they "didn't want to get into details on the ... phone," but he wanted to confirm the money was in hundred dollar bills. Blount said it was all in hundreds "in cash in the United States." Id. at 18.

After Blount verified the form of the currency, Ogle said: "There's a, there's a couple of options. One option is to do it gradually depending on how quickly you would want to get it into the, the system." GX 3a, at 18-19. "The other option is to do it very quickly and you've got two, two options for that. One is with a, a client associate of ours that actually has that volume of cash business. That could just bank it. Because they do that routinely. And then move it out and back." Id. at 19.

After Ogle presented various alternatives, Blount asked him to "start from square one." GX 3a, a 22. "Let's say ... I hand you 12 million dollars in one hundred dollar bills .... What's the next step in ... how it would come back to me?" Id. Ogle said: "The best scenario would be, we would work with another ... associate who has financial capacity to move it into the system very quickly." Id. at 23. When Blount asked how someone could "justify that kind of a cash deposit," Ogle said a Chinese associate of his owns "stores, hotels, shopping centers" and deals

"in a lot of cash ....  They do it all the time." [1] <u>Id</u>. at 24.

Ogle then mentioned another scenario: "We have a diplomat ...
that's associated with Turkey.  And we would bring him in.  He's
done it many times.  And one shot, fly it to Turkey, put it in the
Central Bank.  UBS is the correspondent for the Central Bank of
Turkey."  GX 3a, at 25.  "[T]he only problem with that scenario is
just that cost alone is ten percent."  Plus, Ogle said, "it
involves a little more risk in that you are, you are using a
diplomat who does this routinely an' we wouldn't want to be the,
the lucky guy that ... they stopped."  <u>Id</u>.  Nevertheless, Ogle
vouched for the diplomat, saying "he is in bed with us very deeply
in other ... bigger things."  <u>Id</u>. at 26.

After Ogle presented various options for laundering the funds,
Blount returned to how he got the cash, saying his receipt of the
money was out of the ordinary for him: "All of my business is
totally legitimate."  GX 3a, at 27.  "This is the only thing that
I have ever put my hands on in my life, that's not ....  So I don't
wanna do anything that runs up any red flags ...."  Ogle responded,
"we appreciate that point."  When Hemmings began to remark, "if it
wasn't for that aspect,..." Ogle interjected, "we probably wouldn't

---

[1] Following his arrest, Ogle explained that he intended to
transfer the cash to Michael Zheng, a Chinese businessman in
California.  A set of notes found in Ogle's briefcase reflected a
proposed three-way split of the profits from the deal.  <u>See</u> n.10,
<u>infra</u>, and accompanying text.

be sitting here." <u>Id</u>.

Blount further elaborated on how he purportedly got the cash, saying what he put up "was very, very small," but that his friend had "turned it and made some mega bucks from it." GX 3a, at 28. Blount explained that his friend was a pilot who had "made some trips south" and met "the right contacts" because "he was buying stuff just cheap, cheap, cheap, you know."[2] <u>Id</u>. at 33. Blount then told Ogle and Hemmings how he purportedly became an unwitting participant in the drug deal:

> I said how, how'd we make that much so quick? And then, of course, he told me what he'd done ... an' I had no earthly idea what he'd done. An' I, you know, I don't do that .... [D]on't come to me and say uh, go get me 50 keys of coke .... That's not my bag. I wouldn't touch it, I, but a, again, I guess it's greed. 'Cause I got it sittin' there and I'll be damn if I want to throw it away.

GX 3a, at 34. Ogle – who sat impassively during Blount's description of the source of the funds – told Blount: "[I]f we, we

<hr />

[2] Blount later said, "my guy, he did one big shipment." GX 3a, at 60). When Hemmings said it was remarkable that "he pulled this off as a one shot deal," Ogle – a licensed pilot – commented: "When you can fly, uh, that's all he needed. You'd be surprised at what he could do." <u>Id</u>. at 60-61. Hemmings then described a television program about how traffickers "have guys on their end that actually have the schedule" when radar balloons at the border "come down, for maintenance." <u>Id</u>. at 61. "Well, then they know when to fly." Blount resumed: "I know he went way directly way down south and he picked up one big shipment, delivered it, an' got his money an' that was it." <u>Id</u>. When Blount later reiterated that he personally was "not some drug dealer," Ogle said "that was made very clear to me." GX 3a, at 74.

set up the structure that we talked about ... [a]nd we get

everything into the system ... you can do whatever you want with

it."[3]  Id. at 35.

After reiterating the source of the cash, Blount then looked

for assurance that he would get his money back: "I'm a little

skeptical of handin' anybody 12 million in cash at one time."  GX

3a, at 37.   When Blount suggested they start with "a hundred

thousand or somethin' and ... see how it works," Ogle asked if

Blount could "uncover half a million."  Id.  Ogle later insisted

"it would have to be at least a half."  Id. at 39.  Blount agreed

to start with $6 million.   Id.

Blount then asked Ogle, "How long is it gonna take me until it

goes through the process and I'll be able to get money back?"  GX

3a, at 40.  Ogle replied, "I'd like to say 30 days."  Id.  When

Blount asked Ogle how the transaction would proceed, Ogle replied:

> My next step is to meet with the gentleman that can
> actually put it into the system ....  He gets it in.  An'
> it goes from, from his account in Hong Kong and then into
> the account that we would set up for you.  My, my
> recommendation is Nassau, unless you are uncomfortable
> with Nassau.

Id. at 40-41.  Blount said he would rely on Ogle's expertise.  Id.

---

[3] In contrast to Hemmings, who reacted visibly during the
meeting in Biloxi when Blount first divulged the money was from a
"drug operation," GX 1a, at 12, Ogle displayed no expression when
Blount represented that the source of the funds was narcotics
trafficking.  Compare GX 1 with GX 3 (videotapes of 3/3/01 and
3/28/01 meetings).

at 41.  Ogle then invited Blount to travel to the Bahamas to "meet the people ... [t]hat a, administer the stuff."  <u>Id</u>.  "It's the second largest law firm."  Ogle added they could "set up an IBC trust and even a bank if you would like."  <u>Id</u>.

Blount next asked about what they would charge.  Hemmings answered, "10 points."  GX 3a, at 42.  Blount later confirmed the terms: "I'll bring you 12, 12 million dollars.  You gonna charge me 1.2 ....  That's gonna be your, that's all I gotta pay."  <u>Id</u>. at 50.  Ogle replied: "Correct."[4]  <u>Id</u>.

Ogle then shifted the discussion to what Blount could do with the laundered funds and proposed that he invest in "one of the ... hotel projects we're doing."  GX 3a, at 43.  Ogle also recommended that Blount repatriate the funds in the form of a loan: "I think the key is ... that anytime it comes to you it's always as a loan as opposed to you just bringing money in that you have to explain, how did you make this money in the first place."  <u>Id</u>. at 47.

When Ogle later asked if Blount was able to deliver the money, preferably to Los Angeles, Blount answered, "Actually I prefer you pick it up from me ....  I don't wanna get caught speeding driving, somebody open up my car, that'd be real hard to explain."  GX 3a,

---

[4] Hemmings added there may be a "soft cost ... associated ... with getting the IBC and the trust set up, depending on how sophisticated we're talking about."  GX 3, at 42.  "Without you setting up your own bank..., soft costs are anywhere from 20 to 50 thousand dollars depending on how sophisticated."  <u>Id</u>. at 43.  <u>See</u> also <u>id</u>. at 50-51 (Ogle also describes "soft costs").

at 53.  After the discussion turned to who else would help launder the funds, Blount said, "I don't want to be involved in all these other people ....  I don't want them to know who I am ...."  Ogle replied: "That's the way we do it."  Id. at 59.

Ogle also asked how the cash was stored and confirmed that "it'll take more than one suitcase to do everything."  GX 3a, at 81.  After agreeing that "four large suitcases would be safe," Blount concluded the meeting, promising to be in touch by the weekend.  Id. at 82-83.

The day after the Jackson meeting, Ogle sent Blount a Federal Express package with information about their industrial property in Alabama.  GX 5.  The delivery included a cover letter on Nu-Tech stationery regarding the "Aliceville, Alabama Property."  Id.  In the letter, Ogle advised Blount: "Title to this property is currently vested in our company and we are in the process of executing a new lease with a supplier of components to the Mercedez Benz Plant."  GX 5.  "We would like you to have this information as a reference for future transactions contemplated."  Id.  The package enclosed an appraisal representing the value of the property, the Huyck Felt Plant, as $15 million.  GX 5.

As follow up to forwarding the information about the Alabama property, Ogle sent Blount a fax on April 2, 2001, enclosing documents authorizing him to bind Nu-Tech and showing his control of 80% of its shares.  GX 6.  The fax also included a "Security

Note" for the Huyck Felt Plant, stating: "For value received, Nu-Tech Development Corporation hereby grants, conveys, and delivers a security interest in the above-referenced property in the amount of Twelve Million Dollars ($12,000,000) to Mr. Wendell Blunt."[5] Id.

At trial, Blount said the purpose of the security note was to "collateralize my $12,000,000" by "giving me a secured lien on this property." Tr. 146. While the security note was "not something I could go to the courthouse and file," it was something to hold "as collateral to guarantee that something didn't happen to my $12,000,000 once he got it." Id.

Following the Jackson meeting, Hemmings was placed on house arrest for violating the conditions of his release on his state criminal charge. While he continued to be involved in telephone discussions about the deal, Hemmings relied on Ogle to handle the actual arrangements.

Blount next spoke with Ogle on April 18, 2001, during a conference call together with Hemmings who remained on home confinement. GX 16a: 4/18/01 call. After some preliminary discussion, Ogle pressed Blount about the deal: "So ... Wendell, are we gonna move on the subject matter or is there delay[] ...?" Blount said he was preoccupied with "a major ... problem on one of

_____

[5] After Blount called Hemmings to point 13 out that his name was misspelled, Ogle sent Blount a corrected security note. GX 7, 28a.

14

my deals that's come up." <u>Id</u>. at 29. But Blount reassured that he had "picked up the ... freight and everything James it's ... in my possession ...." <u>Id</u>. at 30. Despite Blount's having told Ogle to expect a delay, Ogle began aggressively pursuing Blount about the deal, leaving him repeated unanswered phone messages, including the following:

• GX 17a (4/27/01, 2:19 p.m.): "Good afternoon uh, Wendall [*sic*] it's Jim Ogle calling .... Uh, give me a holler please .... I ... wanted to let you know where we were. And uh to see what we're doing then."

• <u>Id</u>. (4/27/01, 6:18 p.m.): "Hi Wendall, it's James Ogle again.... I'm available over the weekend if you get back, uh, give me a call."

• <u>Id</u>. (undated, 1:52 p.m.): "Hi Wendall, it's James Ogle calling. Uhm, just following up with you trying to see if we can bring closure uh, to this matter."

• *Id*. (4/30/01): "Hi Wendall, it's James Ogle calling. I left you a message yesterday for you .... I would appreciate a call back uh, I, I want to bring closure to this uh, one way or the other. Give me a call please."

Eventually, Blount returned Ogle's repeated calls and, on April 30, 2001, they were able to resume their discussions about the deal. GX 18a.

When Blount said he was considering "three airports down there on the Coast," Ogle replied that he did not plan to pick up the money by air, but was to transport it by charter plane "the day after" the pick up. GX 18a: T1013b, at 2-3. After agreeing they would not "necessarily need to meet in an airport," Blount said he had decided "we'd just go ahead and do the whole thing at one

15

time." Id. Ogle said he planned to ship the $12 million out "in three phases to keep secured."[6] Id. at 3. Ogle continued to stress his readiness to conclude the deal: "I just would like to kinda bring closure because I've put some systems in place and I keep getting calls ...." Id. at 5. Ogle pressed Blount: "Well ... could you kindly give me a time fix on it, so that I can plan? Because I've ... got to go to Zurich ... an' I really wanna get it behind me if we're gonna do it."[7] Id. at 6. Ogle concluded the call by telling Blount, "let's try and wrap it up, if possible, by the end of the week, I'd really like to free myself up thereafter." Id. at 17.

Ogle and the informant continued to discuss details of the cash pick up during a call on May 1, 2001. Ogle said he was considering using "an 8 pack limo" and making it look like it was just "two or three couples an' just going for a party." GX 19a, at 3. Ogle assured Blount he would have "sufficient security." Id.

---

[6] Notes found in Ogle's briefcase at the time of his arrest showed the transaction was to occur in two stages. GX 12a. During his 4/30/01 call with Blount, Ogle said "phase one is ... very, very straight forward. All, all ground and, in a structure that happens every day." GX 16a: T1013b, at 9. The notes depict phase two as involving three trips, with a transportation cost of $23,000 for each trip. GX 12a; Tr. 283-84.

[7] When Blount asked if the Zurich trip was related to their deal, Ogle said their transaction would involve "a trust company structure ... [a] trust company Zurich bank in the Carribean." GX 16a: T1013(b), at 9. The agents later recovered a flow chart anticipating transfers from a "Swiss Trust" to a "Carribean bank" to "IBC's" and "other banks." GX 12b; Tr. 283.

at 4.  As Ogle described his plan to put two of the duffle bags of cash in the limo's trunk, Blount said, "I don't think you could get two of these in the trunk."  Id. at 5.  When Blount warned Ogle "there'd be a hard explanation to come up with" if they were searched, Ogle said: "I've got that part covered.  I thought about all of that ...."  Id. at 8.

Ogle and the informant resumed discussing the plans by phone the next day.  Blount proposed that the transfer occur at the Point Cadet marina in Biloxi on May 30, 2001.  GX 20a, at 3-4, 7.  Ogle had resolved the issue of storing the cash by arranging, instead of the limousine, to use "a luxury coach," which he described as "a big mini-van that's customized."  Id. at 4.

Ogle confirmed that his "people from Southern California'll probably do the transfers out."  GX 20a, at 11.  Now that the date was agreed, Ogle also would go ahead and a set up a trust for Blount, which "takes me a week to do that, that's no problem."  Id. at 10.  Ogle said it would take no more than six seeks to return the money "based on ever'thing we have in place now."  Id. at 11.

In view of the informant's having begun the deal with Hemmings (who had since been jailed on his state charges and no longer could receive incoming calls), Blount telephoned Hemmings' girlfriend, Johanna Porche, on May 8, 2001, to verify that he was still a part of the deal.  GX 21a, 1-2.  Porche said that, despite his being in jail, Hemmings was still "in daily contact" with Ogle.  Id. at 2.

17

Porche said, "James will handle ... whatever Casey cannot handle."
Id. at 3.

In a three-way call on May 13, 2001, Blount again confirmed
that Hemmings was "ok with James handling [his] part" of the deal
while he was in jail. GX 23a, at 3. Hemmings responded, if he had
not been comfortable with Ogle, he "would have never brought him to
... Jackson that day." Id. When Blount said he planned to go to
the Point Cadet marina to "check it out," Ogle said he also wanted
to travel there in advance of the deal.[8] Id. at 9. Hemmings
wished Ogle and Blount good luck with the deal and joked that he
planned to write a book, "How to Sit in Jail and Make Money." GX
23a, at 11.

When Ogle arrived at the agreed meeting location in Biloxi on
May 30, 2001, Blount telephoned Ogle to give him final
instructions. Ogle was to lock the van, secure the keys, and then
leave while the cargo was loaded. Tr. 169. The agents observed
Ogle exit the van and meet with three other people in a nearby
Chevrolet Suburban. The four of them walked into the Isle of Capri
casino next to the Point Cadet marina. Tr. 264.

Once the van was loaded, Blount called Ogle to say

---

[8] Although Ogle and Blount discussed traveling together to
the meeting location before the deal, Ogle evidently traveled to
Mississippi for this purpose but never met up with Blount. See
Tr. 167, 259-60; GX 29a (Ogle phone message to Blount from
Gulfport airport).

"ever'thing's in place."  GX 26a: T009g, at 1.  After the call,

Ogle and an associate, Roland DeCaires, exited the casino and

walked to the van where the cargo was waiting.  Tr. 266, 376.  The

other two, James Carlton Smith and Michelle Donna Stampey, returned

to the Suburban.  Tr. 266, 376.  When the Suburban began to leave,

the agents arrested Ogle and the others.  Tr. 266-67.

Among the items found in Ogle's van were various documents in

a briefcase belonging to Ogle, along with a nine-millimeter Beretta

handgun loaded with hollow-point bullets.  The agents also found

another loaded handgun in the Suburban.  Tr. 275-76, 285-87; GX 8-

13, 14.

Following the arrests, the agents interviewed Ogle and the

others.[9]  Ogle admitted "it was strange" for him to be picking up

$12 million in cash in a parking lot, but "it wasn't illegal as

_____

[9] Smith testified that Ogle had recruited him to travel to
Biloxi, where Ogle might be "possibly receiving ... a large
amount of funds" from a client whom Smith understood "was a real
estate mogul."  Tr. 369, 409.  Smith agreed it would be unusual
in the real estate business "to have large amounts of cash in
real estate transactions in which individuals drive six hours
away, stuff their duffel bags full of cash in the car, and then
drive back six hours to Atlanta."  Tr. 411.  Smith acknowledged
he was to be paid $25,000 and that he never asked Ogle why, if it
were legitimate money, the client could not just "stick it in the
bank and wire it for $100 or whatever it costs."  Id.  Smith
agreed that he had told the agents following his arrest that the
cash "could have been from illegal activity."  Tr. 413.  After
DeCaires was arrested, he told the agents he "didn't know
anything about money," but only that they had come "to pick up a
package."  Tr. 427.  Later, DeCaires admitted he knew "there was
cash involved, millions of dollars."  Tr. 429.

long as the source of the money was not illegal." Tr. 270. Ogle said he intended to turn the money over to Michael Zheng, a Chinese businessman, to invest it in different businesses in California.[10] Tr. 271.

The documents in Ogle's briefcase included notes for the "Blount Project," listing costs for "Phase I" as including $125,000 in "fees to assistants." GX 12a. The notes also show a breakdown of the costs for "Phase II" based on three trips at $31,000 each and $7,500 for "client set up." From the "$1,250,000 fee," the notes reflect a deduction of $245,800 in total costs to yield a $1,004,200 profit, to be divided by three, with each participant receiving $334,733. Id.

## II. THE § 2255 MOTION

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

To prove ineffective assistance of counsel, a defendant "must meet the strict standard" the United States Supreme Court has established. See United States v. Flores-Ochoa, 139 F.3d 1022, 1024 (5th Cir. 1998), citing Strickland v. Washington, 466 U.S. 668 (1984). Ordinarily, a defendant "must show, first, that counsel's representation fell below an objective standard of reasonableness, and second, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

[10] Among the items found in Ogle's briefcase was an address book listing a "Michael Zheng" of San Marino, California, and several contact numbers for him. GX 10; Tr. 278.

have been different." Id.

Ogle claims the following errors by his counsel: (1) counsel failed to investigate the relevant law; (2) counsel failed to interview and call crucial witnesses; (3) counsel proffered a defense of no legal merit; (4) counsel failed to consult with defendant on certain decisions; (5) counsel failed to notify defendant of inherent conflict; and (6) counsel failed to object to constructive amendment of the indictment.

**1. Investigation of Relevant Law**

The defendant offers two areas in which he believes his counsel was ineffective in terms of understanding the law. First, he argues that his counsel had not given notice pursuant to Rule 609(b) that he intended, in his cross-examination of Wendell Blount, to use convictions that were more than 10 years old. While Ogle is correct that his counsel did not give such notice, there is no basis for his conclusion that the Court would have permitted the use of these convictions even if notice had been given. Furthermore, considering the overwhelming evidence against the defendant, including audio and video evidence of Ogle committing the crimes he was accused of, the use of these convictions against the informant in cross-examination would not have changed the outcome of the trial.

Second, the defendant argues that his counsel was ineffective because in arguing that the recordings made by Blount were illegal,

he failed to use what Ogle now claims is evidence that Blount was pursuing some unlawful scheme other than the work he was doing with the government. Because of this other unlawful scheme, Ogle argues, he does not receive the protection of 18 U.S.C. §2511(2)(d).[11] However, Blount's recordings for the government were not illegal because they were made under color of law. The applicable statute is § 2511(2)(c), not (d). Furthermore, any misunderstanding on Ogle's counsel's part does not provide a basis for relief in this case because there are no arguments his counsel could have made for suppression of these communications. Since the recordings were legal, the defendant cannot be prejudiced by his counsel's raising an invalid point in order to seek suppression.

## 2. Investigate, Interview and Call Witnesses

The defendant claims that his counsel decided not to call certain witnesses because he was concerned about "pissing off the judge." There are a myriad of claims in this portion of the defendant's brief but, even assuming the accuracy of his claims, he has failed to show how any of the evidence would have had an effect on the outcome of his trial. For example, if Mack Robinson had

---

[11] "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d).

testified to a legal transaction, similar in nature to the scheme Ogle agreed to with Blount, that fact would not have negated any of the prosecution's case.  In fact, it may well have strengthened it by showing that Ogle was capable of carrying out the scheme agreed to with Blount.  The decision not to use this witness was not outside the realm of proper trial strategy.  That Ogle may have had other legal transactions does not overcome the overwhelming weight of the evidence that this transaction was illegal and that Ogle knew it was illegal.

The defendant also claims that counsel was deficient in not introducing what he calls due diligence documents which are unsigned but which he claims he uses with all clients.  These documents include an attestation that the funds are of a non-criminal origin.  The evidence at trial showed, however, that Ogle knew the funds were from a drug operation because he had been told as much during his meeting with Blount.  The defendant fails to show how use of the unsigned documents would have had any effect on the outcome of his trial.

The defendant also complains about his counsel's attempt to use a witness who was proffered as an expert but was not allowed to testify.  This witness was offered to testify that Ogle's finances were such that he could not have pulled off the scheme.  The witness admitted that she had not reviewed any financial information from the business entity that Ogle claimed he was going

to deposit the money with. Even if this witness was allowed to testify, or if another witness was called and allowed to testify concerning Ogle's alleged inability to pull off the scheme, Ogle does not offer any explanation of how such evidence could impact the outcome of his trial, given the overwhelming evidence of his guilt.

## 3. Counsel proffered a defense of no legal consequence.

It is unclear which defense the defendant is referring to in this section. Every aspect of his transaction with Blount was audio or video recorded. There was no doubt that Ogle was traveling to Biloxi to get $12,000,000 in cash from Blount, and that Ogle was going to send it through some businessman in California, ultimately to a banking organization in the Bahamas. There is no doubt that Blount informed Ogle that the proceeds were from specified unlawful activity. The defendant did not claim that he was not there or that it was a case of mistaken identity. His defense was that this was a legitimate transaction. It is clear that his counsel presented the only defense with any credibility that was available to him. That defense was put to the jury and was rejected.

## 4. Counsel failed to consult defendant on certain matters

The defendant argues that he told his counsel on the morning trial commenced that he wanted a continuance and that his counsel did not obtain one for him. He does not, however, show how a

continuance would have changed the outcome of his trial.

**5. Counsel Failed to Notify Defendant He Was Under Investigation**

Defendant claims that his counsel suffered from a conflict of interest because he was under investigation by the U.S. Attorney's Office and did not disclose this fact to him. The government has submitted an affidavit from the prosecutor of the case against Ogle's counsel, which states that the government did not begin its investigation until approximately 11 months after Ogle's trial.

**6. Counsel failed to object to a jury instruction**

The defendant claims that the substantive jury instruction incorrectly removed the term "wilfully" from the language of the indictment. The Court used the Fifth Circuit pattern jury instruction concerning the charge against the defendant, and the defendant fails to show how the wording of the instruction constituted error. His counsel was not deficient for failing to object to that which is not objectionable.

**B. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

The defendant claims that his appellate counsel refused to incorporate certain arguments in the letter brief counsel filed with the Fifth Circuit. As set forth in the affidavit of Ogle's appellate counsel:

> Refusal to raise specific issues [on appeal] is not a basis to find ineffective assistance of counsel. Counsel may use reasonable professional judgment in deciding [w]hat are the most promising issues for appellate review and need not raise every issue suggested by the accused.

> Counsel is not required to raise issues which are procedurally barred from consideration by the appellate court. A defendant claiming ineffective assistance of counsel must show that the failure to raise the issue was objectively unreasonable and that, but for this failure, a reasonable probability exists that the sentence or conviction would have been reversed. 24 C.J.S. Criminal Law § 2361 (citations omitted).

Affidavit of John W. Weber, III, ¶ 13. Mr. Weber was appointed to represent the defendant beginning with resentencing.[12] At resentencing, the Court found that Ogle did not qualify for a three-level reduction under §2X1.1 of the guidelines, and that Ogle believed that the funds to be laundered were 12 million dollars, and were the proceeds of an illegal drug operation. On appeal to the Fifth Circuit, counsel argued that Ogle was entitled to the three-level reduction because the substantive offense of money laundering was not substantially completed. Counsel also argued that the government had failed to establish with reasonable certainty that Ogle believed the funds to be laundered were 12 million dollars and were the proceeds of an illegal drug operation. The Fifth Circuit upheld this Court's decision.

Ogle's counsel then filed a petition for writ of <u>certiorari</u> with the Supreme Court, arguing that under the recent decision in <u>Blakley v. Washington</u>, 124 S.Ct. 2531 (2004), the defendant's

---

[12] Ogle appealed his conviction and original sentence. The Fifth Circuit affirmed the judgment of conviction but vacated the sentence and remanded the case for resentencing to address the applicability and effect of §2X1.1 of the guidelines on the sentence. <u>United States v. Ogle</u>, 328 F.3d 182 (5th Cir. 2003).

constitutional rights to grand jury indictment, proof beyond a reasonable doubt, and jury trial were violated when the Court denied the three-level reduction under §2X1.1.  The Supreme Court granted <u>certiorari</u>, vacated the judgment, and remanded for further consideration in light of <u>United States v. Booker</u>, 125 S.Ct. 738 (2005).

In response to an order of the Fifth Circuit, defendant's counsel submitted a letter brief addressing specific issues identified by the Fifth Circuit as relating to <u>Booker</u>.  A copy of the letter brief was provided to the defendant.  Ogle then wrote a letter to his counsel (Exhibit XVII) outlining additional arguments he wanted his counsel to raise.  Mr. Weber responded, addressing the defendant's concerns and explaining the directive of the Fifth Circuit (Weber Affidavit, Exh. B).  The Fifth Circuit reinstated its judgment affirming Ogle's sentence.  A petition for writ of <u>certiorari</u> was filed with the Supreme Court and was denied.

The defendant fails to show any plausible argument that his counsel could have made on his behalf other than those that were raised in the letter brief.  Moreover, he fails to show any objectively unreasonable failure on the part of his counsel that could in any way have prevented his sentence or conviction from being overturned.

### C. CUMULATIVE ERROR

### 1. Failure of Prosecution to Disclose

Ogle argues that "[g]overnment officials had foreknowledge of the dubious origin of the case" and failed to notify the Court. This argument lacks any factual basis.

## 2. False Affidavit

The defendant claims that Agent Tyson presented an affidavit to the grand jury in which he stated that Smith confirmed that Ogle had knowledge of the illegal source of the funds, but that Smith later changed his testimony. Regardless of whether Smith changed his testimony, Agent Tyson's attestation of the defendant's knowledge of the illegal source of the funds came directly from the audio and video tape that confirms discussions between Ogle and Blount about the origin of the funds. Ogle's knowledge of the origin of the funds was proven beyond a reasonable doubt.

## 3. Perjury by Blount

Defendant quotes heavily from portions of Blount's cross-examination. It is clear that defense counsel was pursuing every possible avenue to discredit the witness, but because these avenues were only speculation, defense counsel was unable to discredit Blount. For example, the defendant claims that Blount led the jury to believe that Hemmings and Ogle had a reputation for cleaning up dirty money when they did not have such a reputation. However, the audio and video tape of Ogle's meeting with Blount confirms that Ogle and Hemmings both portrayed to Blount that they had done this before and knew how to launder money.

## 4. Defense Counsel's Failure to Object

Trial strategy is not an exact science. Determining whether or not to make an objection is based first on whether the matter is objectionable and, second, on whether the advantage of winning an objection is outweighed by the possible impact that objecting might have on the jury. The defendant does not point out any truly objectionable matters, and certainly no prejudicial matters. The fact that the Court may have noted that there were few objections does not mean that defense counsel was not doing his job.

## 5. Defense Counsel's Failure to Request Instruction

Ogle claims that his counsel should have requested a jury instruction stating that a government informant (Blount) cannot be a co-conspirator. The government proved beyond doubt that Hemmings and Ogle were co-conspirators. The instruction was not necessary, and given the overwhelming weight of the evidence would not have made any difference in the outcome of the case.

## 6. Intervention by the Court

The defendant claims that he was prejudiced by the Court telling Smith, who was visibly upset on the witness stand, "Not anything going to happen to you, Mr. Smith." Ogle claims that this comment implied to the jury that Smith had nothing to fear from the defendant. The Court's remark did not contain any implication that the witness was afraid of the defendant, and even if it did, it was not so prejudicial as to deprive the defendant of a fair trial.

The defendant has not demonstrated any error in his trial or sentencing, cumulative or otherwise. In his motion for summary judgment, Ogle requests judgment in his favor on his ineffective assistance of counsel claims because of his trial counsel's failure to file an affidavit addressing the allegations in his § 2255 motion. The court finds, however, that the affidavit was not needed, in light of the findings made in this opinion and order. Ogle has failed to demonstrate that his attorney's representation fell below an objective standard of reasonableness, or that there is a reasonable probability that, except for the attorney's unprofessional errors, the results in his proceedings would have been different. Having thoroughly reviewed the record and authorities, the Court concludes that the defendant has failed to establish any constitutional deprivation rendering his conviction, sentencing or subsequent incarceration unlawful. Accordingly,

IT IS HEREBY ORDERED that the petitioner James Orin Ogle's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 **(docket entry 167)** and Motion for Summary Judgment **(docket entry 177)** are DENIED, and this action is dismissed with prejudice. A separate judgment in compliance with Fed.R.Civ.P. 52 shall issue.

SO ORDERED, this the 24th day of March, 2010.

/s/ David Bramlette
UNITED STATES DISTRICT JUDGE